SM

MMW:F-817

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

FILED

AUG 18 2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MARCI MARIE WEBBER, )
)
)
Plaintiff, *Pro se* )
)
vs. )
) Case No. 1:20-cv-07807
)
STATE OF ILLINOIS, et al., ) The Hon. Charles R. Norgle, Sr.
)
)
)
Defendants. )

### MARCI WEBBER'S STATUS REPORT, *Pro Se*

1. **Emergency Complaint Filed On 12/30/20**
2. **Plaintiff's Request for Protection from Harassment Filed 1/29/21**
3. **Continued Harassment and Physical Injury – Request for Hearing**
4. **Request to File Discovery Requests Against Defendants within 28 Days**
5. **Certain Misstatements in the Letter Report of Dan Gallagher, Esq.**
6. **Request to Have Access to My Computer for Legal Research and Communication**
7. **90 Day NGRI Treatment Plan Report Dated February 19, 2021**

*Prefatory Note:* During the time that my Status Report was being typed, I spoke by phone on Tuesday, August 17, 2021 with attorney Harold Hirschman of the Dentons firm, Chicago. As the Court may recall, Mr. Hirschman was appointed by the Clerk to represent me but had to withdraw due to the press of other cases. Today, Tuesday, August 17, 2021, Mr. Hirschman advised me that he is willing to consider representing my interests in this matter. Mr. Hirschman further indicated that he would be able to have a conference call with the Court within the next two weeks and extended his cellphone number 312-307-8026. I would welcome Mr. Hirschman and his firm to assist me as I believe he has a good handle on the issues that are before the Court in this complaint. I shall continue with the finalization of this Status Report which I submit, *pro se*.     MMW

In June 2012 Judge Bakalis, the Trial Judge in the Circuit Court of DuPage County, found me Not Guilty of any crime involving the death of my daughter, Maggie. Since that time, I have been subject to a consistent pattern of punishment (which is unconstitutional) and

1

MMW:F-817

harassment including physical and mental abuse by Illinois Department of Human Services (IDHS) employees and officials.

1.      **Emergency Complaint Filed on December 30, 2020:** I filed a 70+ page *pro se* complaint on December 30, 2020, which factually details a pattern of unconstitutional conduct by the State. In addition, I have referenced in my complaint video taped affidavits that I have prepared that I incorporate by reference. These video taped affidavits are sworn testimony by me which has been the only effective means I have had to detail IDHS's illegal pattern of abusive and unconstitutional conduct.

IDHS's personnel have failed to intervene and have actually incited mentally ill detainees to pick physical fights with me saying "She is a baby killer" or "Marci's going to call the police on you." I have 5 bulging discs in my neck as a result of beatings while in IDHS custody during which IDHS personnel stood by and did nothing to intervene.

One IDHS employee (Marva Stroud) gave me two plastic bags and told me to go to my room and use the bags to commit suicide. I have a photograph of one of the plastic bags. Another IDHS employee (Velma Westbrook) similarly encouraged me to commit suicide while in IDHS custody.

I brought these matters to the attention of Judge Bakalis, but any relief was denied saying he was in DuPage County, the Elgin facility was in another. Later, Judge Bakalis would recognize my claim that IDHS was falsely charting entries: people signed court reports indicating that I was mentally ill, when it was their opinion and the opinion of others that I was not: If I was not mentally ill, I would have to be released immediately under Federal law protecting my constitutional rights (see Foucha v. Louisiana & U.S. v. Jones, both U.S. Supreme Court Opinions regarding rights of NGRI Acquitees)

MMW:F-817

**2 & 3: Request for Hearing on or before September 1, 2021, on my Request for Injunctive Relief to Protect My Person from Unlawful and Unconstitutional Conduct by State Employees as I am being Presently Harmed on a Weekly / Daily Basis:**

For this reason, I am requesting an immediate hearing so that this court can enter an order of protection or other relief from such punitive and unlawful conduct which is contrary to my rights under the U.S. Constitution. I am desperate for intervention and help from beatings incited by and witnessed by State employees who watch and do nothing; seemingly in punishment for a crime I was found not guilty of.

**The Cumulative Effect:** The cumulative effect of the physical and mental abuse factually outlined in my 70+ page complaint filed in December 2020 has been devastating on my physical and emotional health. As one of my doctors, Dr. Mir Obaid at IDHS stated: "A person can only take so much." However, the physical and mental abuse continues.

Specifically, I would ask this Court to issue a writ that orders IDHS to bring me to the Dirksen Building so that I can personally address the Court as I was able to personally address Judge Bakalis *pro se* prior to his order releasing me from IDHS custody in December 2019. Presently there is a Petition for Leave to Appeal (PLA) pending in the Illinois Supreme Court. If they deny relief, it is my intent to refile a Habeas Corpus Petition which was pending before Judge Kocoras in Federal District Court, Chicago.

I am requesting such a hearing on or before September 1, 2021 as it has been pending since January 2020 without being addressed by Mr. Gallagher, my former counsel. He is a nice man, no doubt, but did little to advance my case and filed a Letter Report without showing me first that contained factual inaccuracies (I never called him 10 times in any day but did call him numerous times in a give week when he failed to return my calls repeatedly.) If this Court

MMW:F-817

wishes, I can further outline more material inaccuracies in the Letter Report at a later date.

4. **Request to File Discovery Requests Against Defendants within 28 Days:** I would like leave to file written discovery within 28 days against the defendants. I would also like to take a number of depositions.

*(Note: In light of the possibility of Harold Hirschman representing my interest in this matter, I would defer to his judgement in deciding what discovery, including depositions, need to be taken.)*

5. **Certain Misstatements in the Letter Report of Dan Gallagher, Esq.**

In the interest of time, I have addressed some of this in paragraph 2 and 3 above.

6. **Request to Have Access to My Computer for Legal Research and Communication:**

I was permitted to have my laptop in my room at Chicago Read with unlimited access in 2017. Presently, IDHS refuses to grant me access to my laptop. I ~~also had~~ request access to my own portable internet connection which I would ask this Court to be able to use to do legal research and to communicate with my legal team or counsel via email. In addition, IDHS has taken away my ability to send or receive faxes; and further, has prevented me from receiving timely access to my charts at Read; which makes timely correcting inaccuracies, and substantive ones, virtually impossible.

6. **90 Day NGRI Treatment Plan Report Dated February 19, 2021, states that I am "No longer in need of inpatient psychiatric hospitalization" and that my "mental health needs could better be addressed in a less restrictive outpatient treatment environment":**

The February 19, 2021 Court report by IDHS concludes that I do not meet the standards to be confined any longer because I am not mentally ill or a danger to myself or others. There continues to be serious factual inaccuracies in this report that I can address at a later time. Dr. Anatoliy Pyslar, my treating psychiatrist at Chicago Read for a year and a half admitted to me,

MMW:F-817

"there is nothing in this report they can keep you locked up with." And after assessing me he showed me my chart notes on April 30, 2021, stating: "I recommended your release to where you have the most support, Arizona...either state, oops...I should have just said Arizona." Then Dr. Pyslar resigned. IDHS refused to attach that assessment and chart note to a May 11, 2021, court report as I requested, listing his name as unavailable for signature.

***

The above Status Report was read to me *verbatim* on Tuesday, August 17, 2021, at 2:45 pm at which time I authorized my name to be placed on this Status Report and filed with the Court, *Pro Se*.

Dated: Wednesday, August 18, 2021

Respectfully submitted,

By: */s/ Marci M. Webber*

Marci M. Webber
c/o Chicago-Reed Mental Health Center
4200 N. Oak Park Avenue
Chicago, IL 60634
(773) 794- 4000
MarciWebber101@gmail.com

Attached:   90 Day NGRI Treatment Plan Report Dated 2/19/2021 (10 pp)

## 90-DAY NGRI TREATMENT PLAN REPORT
## MARCI WEBBER
## Docket # 2010-CF-002643
## 2/19/2021

**I.  IDENTIFYING INFORMATION**

Ms. Marci Webber is a 53-year-old (DOB 3/26/1967) twice-divorced Caucasian female who was originally admitted to the Elgin Mental Health Center's Forensic Treatment Program from the DuPage County Jail on 6/18/2012 after having been acquitted Not Guilty by Reason of Insanity (NGRI) on 6/7/2012 by Judge Bakalis for the 11/3/2010 First Degree Murder of her 4-year-old daughter. She was thereafter remanded to the Department of Human Services (DHS) and found to be in need of mental health treatment on an inpatient basis. She was given a Thiem Date of 11/3/2110. Ms. Webber transferred to the Chicago-Read Mental Health Center (CRMHC) on 10/11/2016 but was returned to the medium secure setting at the Elgin Mental Health Center (EMHC) on 11/22/2017 following a reported suicide attempt. She remained at EMHC until her most recent transfer to the minimum secure B-South treatment unit at CRMHC on 10/2/2019 per the order of the Honorable George J. Bakalis. On 12/11/2019, Judge Bakalis conditionally released Ms. Webber to her own apartment located at 775 Pershing Avenue, #7A, Glen Ellyn, IL 60137. Conditions of the release included the following: "Petitioner admonished that she shall adhere to counseling required; she shall submit to alcohol/drug testing as directed, including through the Probation Department; and other proposed terms of the conditional discharge as were stated in the Memorandum dated September 18, 2019." On 12/20/2019, The State of Illinois Appellate Court's Second District granted the State's Attorneys' emergency motion for stay of enforcement of the trial court's 12/11/2019 order directing Ms. Webber's conditional release pending appeal. On 12/23/2019, Judge Bakalis ordered Ms. Webber back into the custody of the Department of Human Services pending the appeal. She was subsequently readmitted to CRMHC on 12/23/2019 to await the outcome of the appeal. Accordingly, Ms. Webber was returned to CRMHC on what amounted to a legal technicality and not because she did not conform to the requirements of her Conditional Release. She did not fail her discharge plan, nor were there any reports that her psychiatric status had deteriorated significantly during that approximately 2-week time interval.

**II.  BASIS FOR CONTINUED TREATMENT**

Per the Unified Code of Corrections (730 ILCS 5/5-2-4): A person acquitted Not Guilty by Reason of Insanity is in need of mental health services on an inpatient basis if "due to that mental illness, [the individual] is reasonably expected to inflict serious physical harm upon him or herself or another and who would benefit from inpatient care or is in need of inpatient care." The Code further specifies that "If the [NGRI] defendant is found to be in need of mental health services, but not on an inpatient care basis, the Court shall conditionally release the defendant, under such conditions as set forth in this Section as will reasonably assure the defendant's satisfactory progress and participation in treatment or rehabilitation and the safety of the defendant, the victim, the victim's family members and others."

Following our extended assessment of her mental health condition and treatment needs, as well as our accumulated knowledge of her history, the Treatment Team is of the opinion that Ms. Webber is no longer in need of inpatient psychiatric hospitalization and

Page 1 of 10

that her mental health needs could be better addressed in a less restrictive outpatient treatment environment. Ms. Webber believes quite resolutely that she is not suffering from any major affective or psychotic mental illness but acknowledges that she does have a significant trauma history that would benefit from ongoing treatment. She has nevertheless refused to routinely work with and interact with members of her Treatment Team in a constructive manner and has been quite resistant to participating in individual psychotherapy at CRMHC. That said, at the present time, she presents with no overt indications of any major mental illness, such as a Psychosis or Major Mood Disorder. What symptomatic indicators Ms. Webber does present with at the present time are much more suggestive of outstanding character pathology (i.e. a personality disorder). It remains a concern of the Treatment Team that her ability to manage her day to day social and personal interactions will be quite challenging however; the possibility of sincerely ameliorating symptoms of a personality disorder in an inpatient setting would be wholly unrealistic. While pharmacotherapy might ameliorate some of these symptoms, intensive psychotherapy with a clinician whose level of expertise and skill are commensurate with these types of disorders would be the most effective intervention. Ms. Webber's behaviors that are routinely described by team members involved in her care indicate that she continues to remain exceedingly confrontational (verbally), and that she frequently engages in harassing, demanding, oppositional, intrusive, provocative, antagonistic, profane, derogatory and demeaning exchanges with staff and patient peers. These types of behaviors (all be they quite provocative) do not imply that Ms. Webber will necessarily present as being an imminent physical threat to herself or others. In fact, she has not initiated any physical aggression toward others while at CRMHC. Although her behavior (whether intentional or not) can at times provoke aggressive responses from others, she does appear capable of controlling those types of impulses within herself. Ms. Webber explains her maladaptive way of treating others to be a type of "defense mechanism" she uses when she feels disrespected or mistreated. She takes very little personal responsibility for any of the aberrant behavior she exhibits, and she typically projects most blame and personal responsibility outside of herself. She summarizes her justification of these beliefs by stating that she has been victimized by IDHS, the doctors, the hospitals, the legal system and the pharmaceutical industry.

Ms. Webber has demonstrated narrow and somewhat limited coping and interpersonal skills, and her level of therapeutic insight is sub-optimal. Prior to her Treatment Team submitting a formal recommendation to the Court for her conditional release, Ms. Webber must acknowledge that she does in fact have viable mental health and substance-related needs that require ongoing intervention services in the community. Additionally, Ms. Webber must improve her collaboration with the Treatment Team as they need to be able to create together, a verifiable and validated aftercare plan. Specifically:

1. Ms. Webber must be willing to permit staff to contact proposed outpatient psychotherapist (Dr. Laura Bauhof) regarding her identified mental health and substance abuse treatment needs. Her outpatient chemical dependency needs were assessed by Ms. Jennifer Micszala, LCSW, CADC from Healthcare Alternative Systems (HAS) DuPage and determined to not meet criteria for an active substance abuse disorder due to Ms. Webber having negative results from

a breathalyzer and UA test however; both Ms. Micszala and her Treatment Team from CRMHC recommend that she follow up with Dr. Bauhof and allow for that clinician's ongoing assessment of both her mental health and substance abuse needs. The Team is aware that Ms. Webber has previously responded to stress by abusing alcohol and incurring a number of DUI's. Any future use of alcohol would dramatically increase her risk of becoming impulsive and possibly symptomatic of her mental illness.

2. Ms. Webber must also cooperate with allowing staff to contact any other appropriate collaterals or potential treatment providers within the community so as to discuss our treatment recommendations (e.g., the Front Door Project).

3. Ms. Webber must permit her Treatment Team to assess the viability of her support system network (such as relations with family, friends, etc.) and to verify her plans of how she will seek out and/or sustain existing funding and financial support for food, clothing, shelter (as well as other life necessities). This will require her to sign appropriate Releases of Information to permit these contacts.

4. Ms. Webber must collaborate with her Treatment Team in crafting a realistic discharge recovery plan that would help her to manage her daily life situations and stressors without resorting to substance abuse, violence or suicidal behaviors.

Ms. Webber's assessment is based on the following:

1. <u>History of Dangerousness to Self and Others</u>: Although Ms. Webber has reported experiencing no recent self-destructive ideation or intent, it is important to recall that she has in fact made viable self-harm gestures in the past. She has typically described the precipitants of these behaviors as having been related to iatrogenic reactions from various psychotropic medications she had taken in the past however; some of these gestures had clearly occurred during time intervals when she was receiving no such medication. Ms. Webber also has an identified history of aggression and substance abuse, and in addition to these variables, she has exhibited numerous changes in mood and perception (i.e. irritability, impulsivity, affective lability, episodic mood swings, mistrust of others, etc.). While these symptoms can be explained by a Mood Disorder and/or a Personality Disorder, at the present time they are thought to be more reflective of the latter.

2. <u>Mood Instability/Persecutory Belief System/Interpersonal Skills Deficits</u>: Ms. Webber continues to exhibit periodic mood shifts, affective instability and a belief system that allows her to project responsibility for conflict outside of herself. She also still exhibits recurrent irritability and verbal aggression toward staff and peers, when she believes she is either being misunderstood, mistreated or "hurt" by their behavior. She also continues to struggle with appreciating and respecting appropriate boundaries between herself, her peers and the staff.

3. <u>Alcohol Abuse by History</u>: Ms. Webber has a documented history of serious alcohol abuse however; she has been alcohol-free during her inpatient care commitment and has reportedly not used any mood-altering substances while outside of hospital custody. It is still believed by her Treatment Team that she would benefit from ongoing services, despite her belief that she has seen it all and heard it all and has "no (active) desire to ever use alcohol" or other mood-altering substances. She recently reported to her psychiatrist that she would be willing to attend AA meetings.

90-Day Report, Marci Webber

4. <u>Non-Compliance with Treatment and Treatment Team Recommendations</u>: Ms. Webber's Treatment Team is still concerned she remains reticent with her belief that she has no identifiable mental health disorder (other than a significant trauma history) or any related issues (such as a proclivity for using or abusing mood-altering substances); and despite having received numerous recommendations from treatment personnel to participate in individual therapy and consider taking psychotropic medication to help mediate her mood instability, she has declined to do so while in the hospital. However; she did comply with two outpatient individual psychotherapy sessions during that prior albeit brief conditional release and participated in one substance abuse evaluation. She also has expressed a willingness to continue her outpatient treatment work with Dr. Bauhof. Additionally, there was no evidence of any clinical decompensation while she was on that prior conditional release.

5. <u>Continuing Care Planning & Relapse Prevention</u>: In order to mitigate perceived risks, it is strongly recommended that Ms. Webber participate in at least weekly individual psychotherapy sessions that will also involve a monitoring of possible substance use/abuse and allow for ongoing drug and alcohol testing. Although Ms. Webber denies having any history of using or abusing alcohol or any other mood-altering substances, she has stated that she believes she is suffering from an extensive trauma history.

### III. TREATMENT SERVICES

A. Following are areas and issues targeted for treatment:
1. Mood instability, persecutory belief system and interpersonal skills deficits
2. Alcohol abuse by history
3. Non-compliance with treatment and Treatment Team recommendations
4. Room Care
5. Continuing care planning and relapse prevention

B. Following is a description of the services recommended for treatment:
1. Individual sessions with Psychiatrist to discuss treatment options and monitor symptoms
2. Prescribed Group Therapies: Daily AM and PM Community Meetings; Daily AM and PM Exercise; Solutions for Wellness; Symptom Management; Stress Management-on hold; Anger/Impulse Management; Moving Toward Change and Relapse Prevention with HAS personnel; AA-on hold; Goals; Recovery; Creative Expression
NOTE: Although on-unit groups resumed on 10/26/2020 facility-wide, the groups on B-South remain somewhat inconsistent due to almost continuous quarantine restrictions related to the COVID-19 pandemic being imposed since mid-November.
3. Personal Safety Plan
4. Case Management Sessions
5. Medical interventions (labs, medications, etc.) as needed

C. Following are the goals of treatment and the anticipated timetable for these goals:
1. Ms. Webber will handle interpersonal conflicts calmly, respectfully and with maturity and will have no more than one episode of screaming and swearing at others when she is angry (Target Date: 2/23/2021): Not Met, continue
2. Within the next two weeks, Ms. Webber will attend 100% of scheduled Impulse Management Groups in order to learn strategies for minimizing her angry outbursts and dealing with negative emotions (Target Date: 2/23/2021): NA, group suspended due to unit quarantine status.
3. While in Impulse Management Group, Ms. Webber will actively participate and discuss her understanding of the principles/strategies taught and how she is applying these principles/strategies to her own life (Target Date: 2/23/2021): NA, group suspended due to unit quarantine status.
4. With ≤ 1 prompt from staff, Ms. Webber will focus on her own issues and treatment versus that of her peers both on the unit and on passes once authorized (as evidenced by peer report and staff observation and the absence of peer and/or family complaints that she is insinuating herself into their treatment programs), 100% of the time (Target Date: 2/23/2021): Partially Met, continue
5. Ms. Webber will meet with her psychiatrist 1x/week to discuss her thoughts about her mental health and treatment (Target Date: 2/23/2021): Met, discontinue (NOTE: Sessions continue, however)
6. Ms. Webber will attend at least 3 substance abuse related groups per week (e.g., AA, Relapse Prevention, Recovery and/or MISA) (Target Date: 2/23/2021): NA, groups suspended due to unit quarantine status.
7. Ms. Webber will actively participate in substance abuse related groups as evidenced by sharing her past difficulties with substance abuse/dependence, accepting feedback from the leader and her peers, offering constructive feedback to her peers, and discussing her plans for future sobriety (Target Date: 2/23/2021): NA, groups suspended due to unit quarantine status.
8. Within the next 3 months, Ms. Webber will develop a written relapse prevention plan that addresses triggers to drinking, how she will manage any urges to drink, and what treatment she will receive to monitor and maintain her sobriety (if granted a conditional release by the court) (Target Date: 2/23/2021): Not Met, continue
9. Ms. Webber will cooperate with a substance abuse evaluation conducted by CRMHC contractual staff from Healthcare Alternative Systems (HAS) (Target Date: 12/3/2020): NA, discontinue. HAS staff state they cannot conduct an evaluation because it has been so long since Ms. Webber last used alcohol.
10. Ms. Webber will collaborate with her Social Worker to identify an appropriate substance abuse treatment provider in the community. (Target Date: 12/9/2020): NA, discontinue. Community agencies that deal with substance abuse will not serve Ms. Webber given the length of time is has been since she last used.
11. Ms. Webber will attend all prescribed/recommended groups at a rate of no less than 70% per month. Groups include: Anger/Impulse Management, Psychotherapy, MISA (aka Moving Toward Change and

Relapse Prevention), AA, Goals, Recovery, Stress Management, Solutions for Wellness, Symptom Management, and daily AM and PM Community Meetings (Target Date: 12/23/2021): NA, groups suspended due to unit quarantine status.

12. Ms. Webber will discard used cups daily as reported by staff for the next 2 weeks (Target Date: 2/23/2021): Not Met, continue
13. Ms. Webber will eat her food in designated area(s) for meals/snacks for the next 2 weeks (Target Date: 2/23/2021): Not Met, continue
14. Ms. Webber will refrain from defacing/destroying State property for the next 2 weeks (Target Date: 2/23/2021): Partially Met, continue

## IV. CLINICAL UPDATE

### Behavior in the Milieu

Very limited progress has been noted with Ms. Webber's interpersonal behavior since the time of her last reporting period. Her general demeanor toward staff and peers continues to be reported as being rather hostile and disruptive to the milieu. She continues to persistently challenge unit rules and regulations by storing and "hoarding" excessive amounts of legal documents/paperwork, snacks, personal hygiene products and other items deemed as being potentially unsafe for consumers. Ms. Webber continues to periodically interfere with the clinical management of certain peers by counseling them to not take certain prescribed medications or to challenge decisions made either by Administration or by treatment personnel (such as restricting access to the outside patio area during inclement weather). She also needs to be regularly reminded to not interact with staff members who are involved in 1:1 observations of at-risk consumers or to not intrude upon or interfere with staff involved in an emergency intervention of an acutely agitated or impaired patient peer. The behavior Ms. Webber continues to model to her peers remains very negatively influential, such as posting derogatory and demeaning statements about treatment personnel on her door, writing on walls, ordering staff and peers to not disturb her while she is in her room, staying up very late and sleeping through meals and scheduled milieu activities. Ms. Webber also uses the unit telephones excessively, usually to call her legal counsel or mediators to complain about a perceived episode of abuse or mistreatment by staff or peers. She also routinely challenges patient privacy and confidentiality by self-reporting the recording of auditory exchanges between herself, staff or peers through that aforementioned telephonic correspondence with her legal consultants (or through use of her Google voicemail) and without the permission of those being recorded. In response to her behavior, some of her peers have complained of her hostile and disrespectful ~~abusive~~ treatment of them, as well as her generalized angry presentation, and certain of her more impaired peers have become increasingly symptomatic as a result. Again, Ms. Webber's behavior is believed to be predominantly a function of her Personality Disorder as opposed to an affective or psychotic mental disorder.

Community trips to medical appointments during this reporting period have included the following:

12/12/2020: Optometry, Fahy Clinic in Chicago. Ms. Webber received glasses and paid the difference between the standard glasses and the more expensive pair she desired. She also received "trial" contact lenses.
1/21/2021: Dental, Dr. Mark Weigel, personal dentist. Regular check-up.

Summary of Sessions with Social Worker/Case Manager
According to Ms. Esther Ellison (Ms. Webber's most recently assigned Social Worker and Case Manager): "My brief experience so far working with Ms. Webber depends upon her moods. Most days, she talks about the past and how much we are hurting her (in a loud tone of voice). On some particularly bad days, she will make threats of filing to the 'Federal' court on me if I do not comply with her immediate requests (such as copying and faxing documents for her, which is what I do for her routinely). When Ms. Webber is in an okay mood, she has been appropriate with me and recently even thanked me for helping her stating that 'when (she) says things, (she is not) saying it personally to me.' Overall, I mail things and fax and copy items for Ms. Webber." Ms. Ellison also listens to her vent about previous concerns.

Summary of Sessions with Psychiatrist
(Per the report of Anatoliy Pyslar, MD, Attending Psychiatrist for CRMHC's B-South Treatment Unit) the following opinions are tendered for the Court's review:

Dr. Pyslar reported having had multiple encounters with Ms. Webber over the past three months, and her response to these encounters has been quite variable, ranging from compliant and engaging to defensive, angry and derogatory. Dr. Pyslar noted that Ms. Webber has been more forthcoming with regard to coming to terms with her daughter's death and the circumstances of such. At the beginning of this current hospitalization here at CRMHC, Ms. Webber appeared to be in significant emotional turmoil and distress when the topic of her daughter's death would be raised. She was prone to expressing more anger (and possibly some unconscious anger toward herself), as well as blaming others for her situation. During recent months, Dr. Pyslar has noted that Ms. Webber has expressed more appropriate and productive emotional responses, including sadness and acceptance of her circumstances. This has been in contrast to her previous presentation, which had been more focused on an expression of anger, and either an inability or an unwillingness to process the events that led to her daughter's untimely demise. In general, she seems to be utilizing better coping skills now when dealing with that loss. Ms. Webber appears to be more future-oriented, expressing more hope for a positive resolution to her situation. She has also verbalized that she hopes to someday reconnect with her other two daughters. At times, Ms. Webber has used profane references about Dr. Pyslar and once came to inform him that he had been added to the lawsuit she has reportedly filed against the DHS. Despite having been encouraged to the contrary, Ms. Webber will continue to express her belief that "You guys will never let me out of here!" and that the clinical team is forever being manipulated by "higher administration" to keep her detained in the DHS. Despite her repeated verbalizations of believing that we "will never let (her) out," Ms. Webber has on occasion been able to express some realistic hope that these circumstances may change in the future. She has also reported a willingness to seek behavioral health services in the community "if" she were to be released. Ms. Webber has specifically stated that she would be amenable to seeking out individual therapy. She would not be willing to meet with an addictions counselor however; stating that alcohol use would not be a problem for her again, as she understands that substance use would have a detrimental effect on one's physical and emotional wellbeing. She also recently mentioned that she would consider attending AA meetings.

When asked by Dr. Pyslar if she had been regretful over her actions at the time of her charged offense ten years ago she declared, "What do you think? I'm not a monster!" and "I would never have hurt my child had I been in the right state of mind... I would never hurt anyone!" Ms. Webber reported her belief that at the time of her index offense, she had been (in her words) "psychotic" and "manic" and attributed those behaviors to numerous psychotropic medications she had either been taking or withdrawing from at that time. Her understanding of what caused her illegal behavior differs from Dr. Pyslar's clinical assessment of her. Dr. Pyslar opines that Ms. Webber's psychosis and mania at the time of the offense had most likely been caused by an underlying mental disorder, possibly triggered by the use of multiple psychotropic medications, particularly multiple antidepressants with unopposed stimulating effect. Dr. Pyslar has discussed that opinion with Ms. Webber on numerous occasions, as well as the possible use of mood-stabilizing psychotropic medications, to which she had repeatedly declined.

It should be noted that Ms. Webber has been expressing a desire to move to Arizona, reporting that she has family members there, such as cousins, an aunt, uncle and a sister. She reports having only occasional contact with them; mostly in the form of receiving greeting cards for holidays and birthdays. Ms. Webber has also expressed a desire to rebuild her relationship with these relatives, who reportedly reside within 1-2 hours (driving distance) from Glendale, AZ. Dr. Pyslar also spoke of receiving some recent correspondence from a Ms. Stelia Corniciuc, who identified herself as being a friend of Ms. Webber's who would be available to help "Marci get back on her feet" in Glendale, AZ by providing her with "everything she would need," such as a car, a telemarketing job, medical benefits, etc. Ms. Corniciuc also mentioned that she has a psychiatrist who comes to her group home to see patients there (and might possibly be able to see Marci) if a move out of state would be deemed plausible.

During mental status examinations, Ms. Webber has persistently denied experiencing suicidal or homicidal ideations; nor has she endorsed any auditory or visual hallucinations. In short, she was not observed to be psychotic, grossly disorganized, manic, or clinically depressed.

Dr. Pyslar opines that Ms. Webber's behavior and clinical presentation here at Chicago-Read (over this last reporting period) has had some improvement and some progress, when compared to her previous presentations. Nevertheless, she continues at times to be defiant, oppositional, argumentative, etc., yet she has still not engaged in any physical aggression toward others; nor has she engaged in any recent behaviors indicative of suicidal ideation or intent. Dr. Pyslar's ongoing observation is that Ms. Webber's patterns of behavior fluctuate from being socially appropriate to exhibitions of maladaptive behavior that often interfere with her treatment and functioning, and as noted above, are most likely attributed to her personality traits and an underlying personality disorder. Dr. Pyslar notes that his opinion regarding Ms. Webber's clinical presentation has been formed and supported by his long-term, direct observation and clinical assessment of this patient over the past fifteen months. He further noted that given the complexity of Ms. Webber's clinical picture and history, it has been necessary and appropriate to monitor and assess her behavior for a reasonable length of time in order to reach a substantiated clinical opinion.

90-Day Report, Marci Webber

**Current Medications:**
No psychotropic medications are currently prescribed for Ms. Webber. Although it is has been suggested that she could possibly benefit from at least the introduction of a mood-stabilizing agent, she refuses to take any psychotropic medication.

**Current Diagnoses:**
Primary:    Unspecified Bipolar Disorder (in full remission)
Secondary:  Personality Disorder, Unspecified, with Borderline, Narcissistic and Paranoid Features; Alcohol Use Disorder in full remission in a controlled environment
Medical:    History of recurrent headaches, chronic neck pain/degenerative joint disease

V. **PRIVILEGE STATUS**
Ms. Webber was issued Patio Pass privileges on 12/24/2019. She was also issued Escorted Grounds Pass privileges on 12/26/2019. Per advice received from DHS Legal Counsel, CRMHC was instructed not to permit Ms. Webber to use the Independent Grounds Pass privileges granted to her by Judge Bakalis during her previous admission to CRMHC without the judge's decision to reauthorize those privileges. On 1/29/2020, Judge Bakalis indicated that he had no jurisdictional authority over Ms. Webber's case at that time while it was in the Court of Appeals, and thus he could not enter any Orders including those related to her request for Independent Grounds Pass privileges. As has been noted, since the onset of the COVID-19 pandemic, all patient pass privileges and all off-unit therapeutic programming have been temporarily suspended.

VI. **PLACEMENT**
Following a prolonged assessment of Ms. Webber's mental status and her continued need for treatment, the Treatment Team is proposing that her continued inpatient commitment does not appear to be achieving any further measurable benefit for her. We have exhausted our efforts of trying to implement interventions and treatments that were believed to be of possible benefit to her. Ms. Webber obliged herself to very little of those efforts, and despite this, she has never come to demonstrate behaviors that rose to the level of her requiring restrictive measures such as contingency medications or restraints at CRMHC. The Team is aware that Ms. Webber was remanded to DHS due to a history of a serious and debilitating mental illness, and that there was a perceived risk that this mental illness would conceivably place herself and others at that same level of risk but her current mental health needs would be better served in an outpatient treatment environment. Her non-compliance with recommended inpatient treatment has been entirely volitional and decided competently. The fact that she has rejected this treatment is more the product of her personality disorder and not a direct result of an affective or psychotic mental disorder. Ms. Webber presents with active symptoms of rather severe character pathology, and her previous symptoms -- at different times diagnosed as Schizoaffective Disorder, Bipolar Disorder and/or Depression -- appear to be in a current state of remission. The basis of her NGRI acquittal was that her symptoms of an underlying disorder had suspended her ability to have appreciated the wrongfulness of her behavior or the criminality of her conduct. Recidivistic studies suggest that the chances of an NGRI acquittee perpetrating another offense of this nature are extremely low. There is nothing from Ms. Webber's current clinical presentation to suggest that she is at any increased risk for harming herself or others. Her behavior can at times be

Page 9 of 10

intensely provocative however; such behavior is willful and goal-directed and once again, not the current product of an affective or psychotic mental disorder. At the present time, the Treatment Team believes that there may be another, more optimal and less restrictive environment that would help to keep both the patient and the community safe. Ms. Webber has always spoken favorably about prior sessions with her outpatient therapist Dr. Bauhof and has reported a willingness to continue seeing this clinician and to follow any additional treatment recommendations afforded her from that therapy base.

**At the present time, the Treatment Team of B-South believes that Ms. Webber is no longer in need of continued inpatient psychiatric treatment, and that her mental health needs could be more adequately addressed in a less restrictive outpatient treatment environment. However; it will be necessary for Ms. Webber to remain in the hospital at this time to work collaboratively with her Treatment Team to create together, a verifiable and validated aftercare plan.** The specifics of this plan were outlined in section II: Basis for Continued Treatment (#1-4) above. Should this plan be completed satisfactorily, the Team will submit a formal request to the Court for her conditional release.

It remains the Treatment Team's professional opinion that in order to have a successful conditional release, Ms. Webber would require ongoing weekly individual counseling, substance abuse treatment and random drug and alcohol testing; and if living more independently, ideally assertive community treatment (or similar-type) services in order to mitigate the risk to herself and the community at large to the maximum extent possible. If Ms. Webber does not have these services in place, and *especially* if she uses/abuses alcohol, the probability that she will pose a risk to herself or others is likely to increase.

### VII. QUALIFIED PROFESSIONALS RESPONSIBLE FOR THE IMPLEMENTATION OF THE PLAN

_____, MSW, SW  
Esther Ellison, MSW  
Social Worker II

_____, MSW, SW  
Sabi Kolath, MSW  
Director, Department of Social Work (TA)

_____  
Anatoliy Pyslar, MD  
Attending Psychiatrist

_____  
Adebisi Olasimbo, RN  
Clinical Nurse Manager

_____  
Timothy Cummings, PsyD  
Licensed Clinical Psychologist

_____  
Robert Sobut, MD  
Medical Director